IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2011

## STATE OF TENNESSEE v. WILLIE LEWIS

**Appeal from the Criminal Court for Shelby County**
**No. 08-05976     James M. Lammey, Jr., Judge**

---

**No. W2010-02517-CCA-R3-CD  - Filed September 27, 2012**

---

The Defendant, Willie Lewis, was found guilty by a Shelby County Criminal Court jury of second degree murder, a Class A felony. See T.C.A. § 39-13-210(a)(1) (2010).  He was sentenced as a Range I, violent offender to twenty-five years' confinement.  On appeal, the Defendant contends that the trial court erred by (1) excluding relevant testimony regarding the victim's tattoo, (2) not permitting the Defendant to refer to the victim's tattoo during closing argument, and (3) issuing a flight instruction that was not supported by the evidence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Willie Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Marlinee Iverson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to an altercation in which the Defendant shot Jerry Williams. Charles Valentine testified that in May 2008, he lived in an apartment at 2566 Peres Avenue and that he shared the apartment with Letrece Thomas and their four children. He had known the Defendant for about two years.  Before the shooting, he gave the Defendant a portable DVD player and a .25 "automatic chrome handgun" in exchange for eighty dollars worth of marijuana.  He said the Defendant returned the next day and asked for a refund after claiming that the items did not work.  He told the Defendant that he would refund the money the next

day, and the Defendant responded, "If I don't get my money, something bad is going to happen – one of us going to leave on a stretcher – somebody is gonna run in the house – shoot the kids." He said the Defendant stated that he had until 9:00 p.m. to refund the money and left the apartment building. He said that the victim was his uncle and that he and his cousin, Kenny Bruce, drove to the victim's home to borrow the money. Mr. Bruce's girlfriend was also in the car with them. They encountered the victim on the drive to the victim's home and told him about the situation with the Defendant. He said that the victim got into the car with them and that he did not know the victim was armed.

Mr. Valentine testified that they returned to his apartment and that the Defendant was sitting at the top of the stairs leading to the apartment when they arrived. He said that the Defendant had a gun in his hand and that the Defendant asked him if he "went and got backup . . . ?" He and the victim walked into his apartment, and the victim showed him a .22 caliber revolver. He said the victim wanted to negotiate a solution with the Defendant. The Defendant knocked on the door and said, "Bro, it's almost 9:00 o'clock. Do you got my money? . . . If I don't get my money, one of us gonna be leavin' on a stretcher tonight. It ain't gonna be me gonna need one, bro." He told the Defendant that he did not have the money, they argued, and the Defendant slapped him. He said that the Defendant had his gun in his hand and that the victim pushed the Defendant into the hallway and they argued for a few minutes.

Mr. Valentine testified that he remained in the apartment while the Defendant and the victim argued in the hallway. He said that the front door flew open, that the victim came into the apartment, and that the Defendant followed with his gun drawn. He said the victim ran toward the back door, removed a gun from the victim's pocket, and told him to get out of the way. He ran toward the back door and was standing beside his refrigerator when he heard a shot come from the front door. He said that the victim opened the back door and crouched down and that he heard the victim fire one shot. He said he saw the Defendant standing near the front door "peeking his head" around the door and shooting. He said he thought he heard three shots.

Mr. Valentine testified that he went next door to a neighbor's apartment and told the neighbor that someone was trying to shoot him and the victim. He asked the neighbor to call the police. He did not hear any additional shots. He said that he saw the victim come toward him with his side bleeding and that the victim died at the scene. He spoke with the police at the scene, gave a formal statement, and viewed a photograph lineup from which he identified the Defendant.

On cross-examination, Mr. Valentine agreed that he was a convicted thief but denied selling things to people in his neighborhood. He said the victim accompanied him to the apartment to negotiate with the Defendant and to provide protection and ensure Mr. Valentine was "all right." He said that Mr. Bruce and his girlfriend were also in the car and that he did not know the victim had a gun at that time. He said the victim opened a twenty-four ounce beer in the car.

Mr. Valentine testified that when they arrived at the apartment, the Defendant was sitting in the apartment hallway at the top of the stairs and loading or cleaning a gun. He said the victim was not there to confront the Defendant, but he agreed the victim took out a gun and asked for ammunition when they were in the apartment. He said the Defendant knocked on the door, asked for the money, and said, "One of us gonna be needing a stretcher, and it ain't gonna be me . . . ."

Mr. Valentine testified that after the victim and the Defendant finished arguing, he heard a shot come from the front door and saw the victim run toward the back door and pull out his gun. He said the victim was already in the apartment when he heard the first shot. He agreed that both the Defendant and the victim fired shots and that he heard three or four shots total. He ran to a neighbor's apartment to call the police. He said he realized that the victim was shot after he looked back into the apartment and saw the victim's side bleeding. He agreed the Defendant did not point the gun at him. He stated that just before the shooting, the Defendant was in the hall and said, "[A]nybody don't want to get shot, get up out the hallway."

Angela Hudson testified that on May 6, 2008, she lived in an apartment across from Mr. Valentine and Ms. Thomas. That afternoon, she and Ms. Thomas's mother were cleaning her apartment when Ms. Thomas brought her baby to the back door and asked Ms. Hudson to watch the child. She said that she asked Ms. Thomas what was wrong but that she did not receive an answer. She said that she heard three gunshots and that about two minutes later, Mr. Valentine knocked on her door, ran into the apartment, and went into her son's room. She said she looked out her back door and saw a man holding a gun and standing behind a pole. She could not see the man's face. On cross-examination, Ms. Hudson testified that she did not know the man standing behind the pole in her backyard but agreed she saw him shooting. She agreed she saw the man after Mr. Valentine ran into her apartment.

On redirect examination, Ms. Hudson testified that she did not know whom she saw in her backyard holding a gun and that she did not hear gunshots when she saw the man. On recross-examination, Ms. Hudson testified that the shots sounded like they came from near her back door.

Letrece Thomas testified that in May 2008, she shared an apartment with Mr. Valentine and their children and that Ms. Hudson lived across the hall from them. She said that on May 6, 2008, the Defendant tried to kick open her door. She said that she went to check her door and that the Defendant was upset, spoke loudly, and stated that if he did not get his money back "he was going to come in with his guns and beat everybody in [the] house . . . ." She went back into her apartment, where Mr. Valentine made telephone calls in an attempt to find money to repay the Defendant.

Ms. Thomas testified that Mr. Valentine left the apartment and returned with the victim. The Defendant was in the hallway when they returned. She said the victim told Mr. Valentine to see if they could negotiate with the Defendant. She said Mr. Valentine asked the Defendant if he could repay one-half the money now and one-half later, but the Defendant refused, became mad, and hit Mr. Valentine in the face. She said the victim attempted to calm the Defendant and stated, "[Y]ou ain't got to take it that far – hold on – calm down." She left the apartment through the back door after she saw the Defendant had a gun. She did not see any other guns. She heard three gun shots and went outside and saw the victim lying on the ground near her back door. She said that she saw a gun on the ground near the victim but that she did not see him holding a gun while he was in the apartment. She did not recognize the gun. She said she did not see the Defendant after hearing the shots.

On cross-examination, Ms. Thomas testified that her apartment door was not kicked open and that she did not see the Defendant kick her door. She said she never saw Mr. Valentine with a gun. She agreed that although she spoke with the police directly after the shooting, she did not tell them that she saw the Defendant slap Mr. Valentine. She said she left the apartment after the Defendant slapped Mr. Valentine. She did not see the shooting. On redirect examination, Ms. Thomas testified that she saw the Defendant take out a black and silver gun when he hit Mr. Valentine. On recross-examination, Ms. Thomas testified that the Defendant did not hit Mr. Valentine with his gun.

Memphis Police Sergeant Robert Tutt testified that he responded to the scene and found .45 caliber shell casings in front of the apartment. He found one .45 caliber shell casing in Mr. Valentine's kitchen and a .22 caliber revolver near the victim.

Memphis Police Lieutenant Walter Davidson testified that other officers were at the scene when he arrived. He did not have a suspect when he left the scene, but a witness later told a police sergeant that she saw the killing and that a man named Willie from Fairfax was responsible. He determined that the Defendant lived at 1493 Fairfax and sent officers to locate the Defendant, but they could not find him. The Defendant turned himself in on May 8, 2008. Lieutenant Davidson said that officers interviewed the Defendant and that the

Defendant told them he threw a .45 caliber handgun into a field after the shooting. The police did not find the gun in the field but found a .25 caliber weapon in the Defendant's home.

Dr. Miguel Laboy, an expert in forensic pathology, testified that he was the assistant medical examiner at the Shelby County Medical Examiner's Office. He said that the victim was brought to the medical examiner's office on May 6, 2008, and that he performed the autopsy on May 7. He said that the victim was shot twice in the chest and once in the left buttock and that the chest wounds were the cause of death.

On cross-examination, Dr. Laboy testified that he documented the victim's clothing and personal items. He agreed that thirteen bullets were found in the victim's jeans pocket. He said that the victim tested positive for ethanol alcohol and that his blood alcohol content was .181. He agreed that alcohol could cause a person to become aggressive and angry but said a person's reaction to alcohol depended on the person's tolerance to alcohol.

Tennessee Bureau of Investigation (TBI) Agent Alex Brodhag, an expert in firearms and ballistics identification, testified that he was a firearms examiner in the forensic services division. He received a .22 caliber revolver, two .22 fired cartridges, five .22 cartridges, one .25 caliber automatic pistol, one .25 cartridge, two .45 caliber fired bullets, and three .45 fired cartridges. He identified the items, and they were admitted into evidence. He said that although the .25 caliber automatic pistol was not functional, the .22 caliber revolver functioned properly. He said his examination of the two .22 caliber cartridges to determine if they were fired from the revolver was inconclusive. He said that although the cartridges had the same firing-pin impression, he did not find enough individual characteristics to conclude the cartridges were fired from the same revolver. He said that although the .45 caliber bullets were fired from the same gun and that the .45 caliber cartridges were fired from the same gun, he did not have a gun to determine if the cartridges and bullets were fired from the same gun.

Memphis Police Sergeant James K. Smith testified that he worked with the felony response unit and that on May 6, 2008, he was dispatched to the scene of the shooting. His primary function was to collect and document evidence. He photographed the scene and collected shell casings, bullets, a .22 caliber revolver, several rounds of ammunition, and two blood samples. He said two .22 caliber shell casings and four unfired rounds of ammunition in the revolver were found behind the apartment. He did not find .22 caliber bullets that had been fired. He found two .45 caliber shell casings near the front door. He identified photographs of the scene, and they were admitted into evidence.

Memphis Police Sergeant James Terry Max testified that he worked in the homicide division and that he responded to the scene. He was told that a man named Willie who lived on Fairfax might be a suspect. He searched the police database and located the Defendant. He said that the Defendant came to the police station on May 8, 2008, and was interviewed by him and Sergeant Caroline Mason. He said the Defendant told them that the victim had his right hand in his pants pocket as he walked toward the building and that when the Defendant began discussing the debt with Mr. Valentine, the victim stated that Mr. Valentine did not have to pay the Defendant. The Defendant stated that the victim entered Mr. Valentine's apartment and told everyone to leave the apartment through the back. He said the Defendant stated that the victim stepped back into the front entryway, that the Defendant took out his .45 caliber handgun from his right rear pocket, and that the Defendant shot the victim once after the victim aimed a chrome pistol at the Defendant.

Sergeant Max testified that the Defendant told them that after he shot the victim, he walked to the front of the building to "take cover" but returned to the entryway when he remembered that people remained in the white car out front. He said the Defendant stated that he ran from the apartment and headed toward Fairfax and that he threw his gun near a dead tree as he ran.

Sergeant Max testified that he left the interview room to discuss the Defendant's version of events with Lieutenant Davidson because the Defendant's version was not "matching up with what we knew had happened." Sergeant Max testified that he returned to the interview room and that the Defendant's version of events remained mostly the same. He said the Defendant stated that after he took cover in front of the building, he returned to "finish off" the victim. When asked what "finish off" meant, the Defendant stated that he returned to the apartment to kill the victim. The Defendant told them that he heard a click when he pulled the trigger and the gun did not fire. Sargent Max said they left the interview room but returned for a third round of interrogation.

Sergeant Max testified that he confronted the Defendant with information from other witnesses and that he told the Defendant that the Defendant's version of the time frame was too long. He said the Defendant stated that he fired the first shot after the victim raised his gun and aimed it at the Defendant and that instead of taking cover, he immediately followed the victim into the apartment and attempted to fire again, but his gun clicked and did not fire. He said the Defendant stated that both he and the victim had their guns in their hands. The Defendant told them that he ran from the apartment after his gun misfired.

Sergeant Max testified that he and Sergeant Mason left the interview room and spoke with Lieutenant Davidson, who instructed them to obtain a typed statement from the Defendant. He said the Defendant was given the opportunity to read the completed statement

and make corrections to it. The Defendant initialed the first three pages, made a correction to the fourth page, and signed the statement. He identified the written statement and read it to the jury.

In the statement, the Defendant said that he knew the police were investigating the victim's death, that he was responsible for the victim's death, and that he used a .45 caliber Taurus handgun to shoot the victim. He said that the day before the shooting, he purchased a gun from Mr. Valentine, whom he referred to as "Dread Head," but that the gun did not work. He returned to Mr. Valentine's apartment complex the next day, and Mr. Valentine said he would refund the Defendant's money but needed time. The Defendant stated,

> Dread Head left in a white car and said he would be back later[.] . . . I seen the white car pass. I stood at the end of the hallway and . . . sat down and the car pulled up[.] Dread and the Victim got out of the white car[.] Dread walked up in the hallway and we were trying to work out how he was going to pay me[.] [T]he Victim was still by the white car on the street and was telling them to pull down. And the victim told another person in the back seat not to get out[,] that whatever he had was too big. Dread came back to the door and said can he pay me when he get back or in the morning that he was leaving to go get some more money. Dread Head went into his apartment to use the phone . . . I asked the other people in the hallway did they know the Victim and everyone said no. I went up the hallway stairs and took my 45 from my right waist and put one in the head and put it in my back right pocket . . . the victim approached the hallway smoking a cigarette with his right hand in his pants pocket . . . [and] we start[ed] arguing. He told his cousin to leave out[,] he was like he was going to deal with me and he pulled a chrome pistol. I went to backing up. I asked why you getting in our business when we have already been trying to work it out. The Victim started yelling and told his folks to get back[,] he fixin to do me[.] [W]hen he pulled out the gun Dread Head and his folks in the house ran out the back door. He start[ed] approaching me still hostile. I was backing up with my hands up. I took a step back out of the hallway[.] The Victim told everyone in the hallway to clear out, when the last two people ran out the hallway he starting walking from the apartment doorway toward me where I was standing just outside the hallway door. I pulled my pistol out . . . when the dude had

-7-

made it to the hallway door[.] [A]s he was turning and aiming at me I shot him. That when he turned and ran back into Dread Head apartment[.] I chased him into the living room and I stopped when I saw the blood on his back[.] I tried to fire and I heard a click. I turned around and ran back toward my house.

The Defendant stated that the victim did not fire at him but that the victim raised the gun "like he was going to aim and shoot." He said he chased the victim into the apartment to "finish him off. . . . Kill him." He said he did not wait for the police after the shooting because there were people in the white car and he was scared.

On cross-examination, Sergeant Max agreed the victim was shot three times. He said the Defendant never stated that he acted in self-defense. He said the Defendant stated that the victim did not fire at him. He agreed that the Defendant said he feared for his life when he saw the victim holding a gun. He agreed the Defendant said that the victim pulled out a gun first and that he fired one shot at the victim after the victim approached in a hostile manner. He agreed the Defendant's version of events did not change from one interview to the next, other than his stating that he immediately followed the victim into the apartment after firing the first shot. On redirect examination, Sergeant Max testified that the Defendant never admitted firing more than one shot. He agreed the Defendant changed his story when he learned what the police knew. He said Fairfax Street was about two blocks east of Peres Avenue.

The Defendant testified that shortly before the shooting, he bought a small handgun from Mr. Valentine but that the gun did not work. He told Mr. Valentine that the gun did not work, and Mr. Valentine said he would refund the money. He said Mr. Valentine stated that he did not have the money and that he needed "a minute" to go make some money. He said that he did not give Mr. Valentine a deadline to repay him and that he saw Mr. Valentine leave in a white car with two other people.

The Defendant testified that he remained in the building visiting friends and saw Mr. Valentine and the victim drive up in the white car. He had never met the victim. He said that the victim remained near the car smoking a cigarette, that someone in the car asked the victim if they could get out of the car, and that the victim told the person, "No, that's too big." Mr. Valentine walked to the building and told the Defendant that he had not yet made all the money to repay the Defendant.

The Defendant testified that the victim told the driver to "pull down some" and that the car moved about ten or fifteen feet down the road. He said that the victim walked toward the building with his hand in his pocket. He said that he did not "feel right" after the victim told

the driver of the car to pull down the road and that he walked up the apartment building steps and placed a round of ammunition in the chamber of his gun "in case something happened . . . ."

The Defendant testified that the victim entered Mr. Valentine's apartment and that Mr. Valentine came out about ten minutes later and offered to trade the Defendant something to repay the debt. The Defendant said that he replied, "Hell, no, I don't want no trade" and that Mr. Valentine ran back into the apartment. The Defendant walked to the doorway and stated, "[W]hat you runnin' for? . . . you're comin' to an agreement . . . to pay me . . . I ain't fixin' to do nothing to you." He said the victim replied, "Hold up, man, what you doin? Really, he shouldn't even be paying you . . . I'm sick of you all over here." He explained to the victim that he and Mr. Valentine were trying to work out an agreement and that the victim was not involved, and the victim responded, "Man, you disrespectful . . . we gonna have to teach you . . . ." He told the victim, "[H]old on . . . I don't even know you." He said that he asked Mr. Valentine to tell the victim that they were trying to work out a solution but that Ms. Thomas screamed and he saw the victim holding a gun.

The Defendant testified that when he saw the gun, he began "pleading" for his life and asked the victim why a gun was necessary. He said the victim told Mr. Valentine and Ms. Thomas to leave because he was "fixin' to do" the Defendant. He told the victim that the victim did not need to "do this" and asked Mr. Valentine to speak with the victim, but Mr. Valentine ran out of the house. He again told the victim that the victim did not need to "do this," but the victim replied, "No, because you b---- over here playin'. We fixin' to get you all in line over here." He said that he looked around for a way out of the building and that the victim told everyone in the hallway to "get the f--- out of the hallway" if they did not want to die. The Defendant said he interpreted that to mean that the victim was preparing to kill him. He said that he took out his gun for protection and that he shot the victim when the victim raised his gun.

The Defendant testified that he remembered firing the gun only once, but he did not dispute that the evidence showed he fired three times. He said that everything happened quickly and that he attempted to defend himself. He said that he thought the victim was going to kill him and that he had to shoot the victim to survive. He said that he followed the victim into the apartment but that he turned and ran when he saw the victim bleeding and running away.

The Defendant testified that he ran home and got his family out of the house and "to safety." He said he feared for their safety because he remembered the car full of people that were with the victim. He went to his girlfriend's home and told his brother that he needed to call the police because someone tried to kill him. While he was there, he saw a news story

stating that the victim died. He said he called his uncle, who was a retired police lieutenant, and asked his uncle to go with him to the police station because he did not feel safe on the streets. He said that he surrendered to "be a good citizen" and to "do the right thing" and that he did not speak with the police before surrendering.

The Defendant testified that he told the police that he was scared and shot the victim in self-defense. He said he turned himself in around 11:00 a.m and that he finished his written statement around 9:00 or 9:30 p.m. He said that the police badgered him and that he was tired when he gave his third statement. He said he told the truth in order to go home. He agreed his statement said he entered the apartment to "finish off" the victim, but he said he only made the statement in response to the officers' questions. He said that he did not remember going into the apartment or why he entered the apartment and that his actions were "self preservation." He said that he initially told the officers he did not remember why he entered the apartment but that an officer stated, "It's okay. If someone is tryin' to kill me, then I'm gonna kill them." He replied that he was not thinking during the incident, and the officer told him, "Well, if you were thinkin', you would probably go in there and try to finish someone who is trying to kill you." He replied, "Yeah, if you were thinkin', you would probably go in there and try to finish someone who is trying to kill you." He said that he reviewed three typed statements over two hours, that he was not paying attention, and that he said, "[Y]eah, yeah" and signed his name. He said that he shot the victim because it was "either shoot or be shot" and that he would not have shot the victim if the victim had not "pulled" a gun on him.

On cross-examination, the Defendant testified that he completed two or three typed statements but that only one was brought to court because the police "used the one they wanted." The Defendant agreed that after he spoke with the police a few times, they took a typed statement. He agreed that the statement said he should sign it if he found it to be true and correct and that he understood the instruction, but he said he signed it after being at the police station for twelve hours. He agreed that he read the statement and that he did not make any changes to it, except to add a dollar sign. He said the officers told him to make the correction.

The Defendant testified that he threw the .45 caliber gun in a pathway near the apartment when he ran but denied trying to get rid of the gun. He said he was not thinking when he threw the gun and was trying to get to his family to get them out of his house. He said he was afraid of the people in the white car.

The Defendant testified that he did not go into the apartment to "finish [the victim] off." He said that although he signed his statement, he did not tell the police that he went into the apartment to "finish him off." He said that Sergeant Max "slipped" the phrase into the statement and that he was not paying attention. He subsequently admitted that he used the

-10-

phrases "finish him off" and "kill him," but he said that he and Sergeant Max were speaking about a generalized situation involving how a person would react if someone tried to kill them. He said that he was trying to "neutralize the threat" when he entered the apartment but that he ran when he realized the victim was bleeding and trying to get away. He agreed he waited two days to turn himself in to the police.

The Defendant testified that he did not threaten anyone or give Mr. Valentine a 9:00 p.m. deadline to make the payment. He agreed the victim "jumped in his business" and said the victim was very hostile. He said he did not hit anyone. He said he shot the victim when the victim aimed the gun at him. He agreed he consistently told the police that he feared for his life and that he shot the victim only after the victim took out a weapon. On redirect examination, the Defendant testified that he had no memory of what happened after he fired the first shot and entered the apartment.

The jury found the Defendant guilty of second degree murder. The trial court sentenced the Defendant as a Range I, violent offender to twenty-five years' confinement. This appeal followed.

**I**

The Defendant contends that the trial court erred by excluding relevant testimony regarding a "Killa" tattoo on the victim's arm. The State contends that the trial court did not err by excluding the testimony because without further foundation, it had no bearing on whether the victim was the primary aggressor. The State also contends that even if the testimony regarding the tattoo was relevant, it was cumulative and that any error in excluding it was harmless. We conclude that the trial court did not err by excluding the evidence.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403 advisory comm. note). The trial court's decision to admit or exclude evidence will be overturned on appeal only when there is an abuse of discretion. See State v. Samuel, 243 S.W.3d 592, 599 (Tenn. Crim. App. 2007). "Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this

court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses." State v. Schiefelbein, 230 S.W.3d 88, 133 (Tenn. Crim. App. 2007) (citing State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984)).

The record reflects that during the cross-examination of Mr. Valentine, defense counsel attempted to ask if Mr. Valentine knew why the victim had the word "Killa" tattooed on his arm. The State objected on relevance grounds, and defense counsel stated that he wanted to offer the evidence to impeach Mr. Valentine's testimony that the victim's nickname was "June Bug." The State noted that the victim had additional tattoos, and the trial court noted that the tattoo could mean that the victim considered himself a "lady's man." The court stated that testimony regarding the tattoo was "irrelevant at this point . . . . You can't get into it yet" and referenced an earlier jury-out hearing in which it told defense counsel that he could not introduce evidence indicating that the victim was the first aggressor until the evidence raised the issue of self-defense.

With regard to the impeachment value of the evidence, although Mr. Valentine referred to the victim as "June Bug" a few times during direct examination, Mr. Valentine never stated that the term was the victim's nickname in the community. There was no evidence that the victim considered "June Bug" or "Killa" to be his nickname. The Defendant offered no proof that the victim went by a nickname, and the record does not support his belief that a tattoo on the victim's arm was a nickname. As a result, the tattoo was not relevant to impeach Mr. Valentine's testimony. The Defendant argues that in addition to its impeachment value, evidence of the tattoo was relevant because evidence that the victim "chose to permanently communicate an expression of aggressive behavior through a . . . tattoo tends to make it more probable that the victim was brought in as a threat and that he was the first aggressor." There was no evidence that the victim's tattoo was intended as an expression of aggression or that the Defendant saw the tattoo or interpreted it as a threat. Furthermore, evidence that the victim was the first aggressor was not admissible when defense counsel sought to question Mr. Valentine regarding the tattoo. "'[B]efore a defendant can offer proof of evidence of first aggression . . . [s]elf defense must be at issue by the evidence in the record, not by the words and statements of counsel.'" State v. Ruane, 912 S.W.2d 766, 781 (Tenn. Crim. App. 1995) (quoting State v. Laterral Jolly, No. 02C01-9207-CR-00169, slip op. at 9-10 (Tenn. Crim. App. Dec. 15, 1993), perm. app. denied (Tenn. 1994)), abrogated on other grounds by State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998). The issue of self-defense had not yet been raised by the evidence, and nothing indicated that the victim was the first aggressor when the Defendant sought to question Mr. Valentine regarding the victim's tattoo. We conclude that the trial court did not abuse its discretion by preventing the Defendant from questioning Mr. Valentine regarding the victim's tattoo. The Defendant is not entitled to relief.

The Defendant contends that the trial court erred by refusing to allow him to refer to the victim's "Killa" tattoo during closing argument because evidence of the tattoo was previously admitted in the medical examiner's report. The State contends that the trial court did not restrict the Defendant's closing argument but ruled that the State would be permitted to introduce rebuttal evidence of the Defendant's character for violence if the Defendant wanted to argue that the victim's tattoo created an inference of the victim's violent character. The State argues that this issue is without merit because the Defendant chose not to mention the tattoo during closing argument in exchange for the State agreeing not to present rebuttal evidence. We conclude that the trial court erred by ruling the Defendant could not mention the victim's tattoo without opening the door to rebuttal evidence of his violent character, but we also conclude that this error was harmless.

The record reflects that Dr. Laboy relied on his medical report to assist in his testimony and that the Defendant moved to admit the report into evidence. The report was admitted, and it states that the victim had a tattoo stating "KILLER" on his right arm.[1] At the close of the evidence, the State moved to prevent the Defendant from mentioning during closing argument that the victim's tattoo created an inference that the victim was the first aggressor. The State and the trial court initially stated that the Defendant could note that the victim had the tattoo but should not be able to make any argument as to its significance without opening the door to rebuttal proof regarding the Defendant's violent behavior. Defense counsel suggested a compromise under which he would simply note that the evidence showed the victim had a tattoo stating "Killa," and make no argument that the tattoo was evidence that the victim was the first aggressor. The State and the trial court then changed positions and wanted to bar any mention of the tattoo unless the State was permitted to introduce rebuttal evidence. The court stated that even if the Defendant did not argue that the tattoo was evidence of aggression, merely pointing out the tattoo would create an inference that the victim was a killer and provide slight corroborative proof that the victim was the first aggressor. The court stated that "the only inference that could be gotten from that is that the man's a killer," despite stating earlier in the trial that the tattoo was ambiguous without further proof and could just as likely mean that the victim considered himself to be a lady killer or ladies' man. The court ruled that if the Defendant planned to mention the tattoo in any way during closing argument, the State would be permitted to put on a rebuttal witness who would state that the Defendant was violent and fired shots at him during a fight a few weeks before the victim's death. The Defendant elected not to mention the tattoo, and the State did not present the rebuttal witness.

---

[1] The trial transcript states that the victim's tattoo read, "Killa."

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). The State and the Defendant "must both be given the opportunity to argue the facts in the record and any reasonable inferences that may be drawn therefrom." State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (quoting Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001).

Tennessee Rule of Evidence 404 states that if a defendant offers evidence of a character trait of the victim, the State is permitted to introduce rebuttal evidence and evidence of the same character trait of the defendant. Tenn. R. Evid. 404(a). "Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). Opening and closing statements are arguments, not evidence. Thompson, 43 S.W.3d at 523; State v. Nathan McKissack, No. 01C01-9804-CC-00190, slip op. at 13 (Tenn. Crim. App. Feb. 19, 1999), perm. app. denied (Tenn. Oct. 4, 1999). Because opening and closing statements are not evidence, they provide nothing for the State to rebut and do not open the door to character evidence pursuant to Tennessee Rule of Evidence 404. See Nathan McKissack, slip op. at 13.

Here, the Defendant wished to mention during closing argument that the victim had a tattoo on his arm that read, "Killa," without making any additional argument regarding the significance of the tattoo. This was a fact already before the jury and was predicated on evidence introduced during the trial. Furthermore, such a comment would not have been evidence and thus would not open the door for the State to offer character evidence pursuant to Tennessee Rule of Evidence 404(a). We conclude that the trial court abused its discretion by ruling that the Defendant could not mention in his closing argument a fact that was already in evidence without opening the door to rebuttal evidence of his violent character. Although the Defendant was restricted in his ability to remind the jury of the previously admitted evidence due to the trial court's ruling, the jury had the opportunity to view the medical report and the statement that the victim had a tattoo that read "KILLER." Furthermore, the evidence against the Defendant was strong. The record reflects that the Defendant was upset after having been sold a broken gun, that he demanded his money back, and that he loaded his gun in the hallway before any argument or violence began. The Defendant told the police that the victim did not fire at him, that he shot at the victim, and that he chased the victim into the apartment to "finish him off. . . . Kill him." We conclude

that any error in limiting the Defendant's ability to highlight the victim's tattoo during his closing argument was harmless in light of the evidence against the Defendant and the fact that evidence of the victim's tattoo was proven and before the jury during their deliberations. See T.R.A.P. 36(b). The Defendant is not entitled to relief.

## III

The Defendant contends that the trial court erred by issuing a flight instruction that was not supported by the evidence. He argues that the instruction was not warranted because his withdrawal from the scene was not for the purpose of evading arrest or prosecution and that there was no evidence he evaded the authorities, or otherwise concealed himself in the community. The State contends that the instruction was warranted by the evidence. We agree with the State.

In criminal cases, the trial court has the duty to charge the jury on all the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). Before a flight instruction may be given, "there must be sufficient evidence to support such instruction. Sufficient evidence supporting such instruction requires 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004) (quoting State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (citation omitted)).

The record reflects that after the shooting, the Defendant ran from the scene and that as he ran, he threw the gun he used to shoot the victim. He went to his home, gathered his family, and went with them to his girlfriend's home. A short time later, he saw a news story stating that the victim died. Lieutenant Davidson testified that he knew the Defendant's address and that he sent officers to locate the Defendant but that they could not find him. The Defendant turned himself into police on May 8, 2008, about thirty-eight hours after the shooting. The Defendant does not dispute that he ran from the scene, threw the murder weapon as he ran, and removed himself and his family from his home. Although the Defendant testified that he left the scene and his home due to safety concerns, a defendant's specific intent for fleeing a scene is a jury question, and a flight instruction is not prohibited when there are multiple motives for flight. See Berry, 141 S.W.3d at 589. We conclude that the sufficient evidence exists to support the flight instruction and that the trial court did not err by giving the instruction.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE